### RATABLE POLLS.

A COMMITTEE, consisting of one member from each county, having been appointed to consider " so much of the governor's speech as relates to amendments of the constitution, or

[1] 56 J. H. 201.    [2] Same, 201.

establishing some legal provisions by which the house of representatives may be reduced," the committee voted, that the chairman be instructed to desire the attorney general to attend the committee, and submit to them his opinion on such questions, concerning the matter before them, as the committee might propose.

In pursuance of this vote, Mr. Attorney General Austin addressed the following communication to the committee :—

" Gentlemen,—The questions which you did me the honor to propose to me resolve themselves substantially into this, viz :—

Whether the term 'ratable polls,' in the constitution, c. 1, sec. 3, art. 2, is forever to distinguish the same classes of persons, who, at the adoption of the constitution, were designated by and included within it; or may from time to time, by the legislature, be made to include more or fewer classes than it originally included ?   A case in point may explain the nature of the question.

At the adoption of the constitution, certain male citizens between the ages of 16 and 21 years were ratable polls.   Are citizens of like age always to be considered ratable polls within the meaning of the constitution above cited ?

A true answer to the questions you have proposed would determine what power the legislature possesses, to alter the aggregate representation in the popular branch ; and because by one mode of considering these questions, the legislature would possess very considerable power to augment or diminish it, there seems, at first view, to be some reason against such a consideration of the subject.

The object of the constitution was to establish a permanent basis for a representation of citizens, and it assumed as a standard of measure ratable polls in municipal corporations.

But if this standard of measure may be varied, and especially if the legislature may vary it, there is nothing permanent in the rule.   The same municipal corporation, having in two successive years the same number of inhabitants, may, by a change of the standard of measure, be entitled to larger, or

confined to a smaller number of representatives, in the one year than in the other.

Such a power in the legislature has been sometimes supposed inconsistent with the spirit of the constitution, and therefore that no construction of the constitution, which should authorize it, could be correct.

But it should be remarked, that no change in the standard can alter the rule of proportion, which will continue to be the same that it now is, in relation to every town in the commonwealth, whether the whole number of representatives be many or few.

It may also be proper to question the soundness of any argument, drawn merely from the supposed inconvenience of allowing to the whole legislature a power over the number of representatives in the popular branch. Legislators are themselves the people. They are so directly, intimately and entirely a portion of the people, that the last danger ever to be apprehended, to the liberties and freedom of the commonwealth, is that which will arise from any exercise of their authority.

It may also be questioned, whether a standard, liable to be changed, from time to time, by the intelligence and judgment of the whole government, so as to meet the changing wants and convenience of a growing and vigorous people, does not better comport with their prosperity and happiness, than one, which, established in the infancy of the commonwealth, might refuse to bend its iron rule to the increasing stature of the state.

But whatever speculative opinion might be entertained on this question, it seems to me to be settled by authority, from which I do not feel at liberty to appeal. I refer to the opinion of the supreme judicial court on an application made to the judges, under an order of the house of representatives of the 6th February, 1811, reported in Mass. Term Reports, vol. 7, page 523, and inserted in the Reports of Contested Elections in the house of representatives, page 107. See *ante*, 117.

To understand the application of that opinion to the present

questions, I must ask your indulgence to a preliminary remark.

The term 'ratable polls' in the constitution has at different times been the subject of difficulty in two respects. First, in understanding what was its precise extent and meaning; and second, that being settled, whether a particular person, or class of persons, came within the definition. For example under the first head, whether it included students, clergymen, soldiers, aliens, &c., and under the second head, whether particular persons, borne on the list as ratable polls, were students, clergymen, &c., within the assumed definition.

In process of time, many of the doubts arising in this respect have been removed, and definitions settled, and it now seems well agreed, that the term 'ratable polls,' designates all those inhabitants who are made liable by law to be assessed to the payment of a poll tax, whether they be so assessed or not; or whether, being assessed, they pay or do not pay.

In one sense, every inhabitant is liable to be assessed; that is, the legislature may enact that his poll shall be taxed, and therefore, whether they do so enact or not, he is exposed to the liability of the enactment, and may be considered taxable or ratable. But this is clearly not the sense in which the term is used in the constitution, because in this sense it would be equivalent to the whole population, and the term 'ratable polls' would be synonymous with all inhabitants, or at least all male inhabitants, which has never been pretended. The term is used in a more restricted sense, and means all those persons who under the operation of a tax act are made liable to taxation *per capita*. The fact of being liable to the action of the assessors, under a law that is in force, not the fact of being liable to be the subjects of a law that is not made, becomes a criterion for determining whether a person is or is not a ratable poll.

This is settled by the uniform practice of the government. Minors over sixteen have always been included in the tax acts, as persons to be rated, and considered of course ratable polls. Minors, under sixteen, have never been included in the tax

acts, and have for that reason alone never been considered ratable polls. But it cannot be doubted that the legislature might include the latter in the next tax act, or direct that minors over fifteen years, or fourteen years, or any other period, in its discretion, should be included, and the persons thus included must thereafter be deemed and taken to be ratable polls.

Whether a person is a ratable poll does not depend on the question, whether the legislature may rate him, but whether the legislature has put him among persons to be rated; and it does not depend upon his being rated by the assessors or other persons, intrusted to carry into operation the direction of the legislature, because it is his liability under the order of the law, and not his compliance with that liability, that ascertains his character as a ratable poll.

The tax acts have uniformly included all males above the age of sixteen years as ratable polls.

But the provision extending to all males above sixteen years included aliens living within the commonwealth.

If, therefore, aliens, by force of that provision, became ratable polls, then the town in which they reside has its right of representation increased by such aliens; and for every two hundred and twenty-five ratable aliens, such town acquires a corporate right to one additional representative.

It became, therefore, a question whether aliens could be ratable polls within the meaning of the constitution.

That question was proposed to the judges of the supreme judicial court, as before mentioned, and the judges replied, that the polls of aliens may, within the true intent and meaning of the constitution, be ratable polls, when and so long as they are made liable by any legislative act to be rated to public taxes.

The effect of this answer is obviously to say, that when they are not made liable by any legislative act to be rated to public taxes, then and thenceforward they are not ratable polls.

The judges add: ' The polls of male aliens above the age of sixteen years are now by law liable to be rated to public

taxes, and now are ratable polls within the intent and meaning of the constitution.'

This plainly implies that only because they were then (in 1811) rated, and not because they had been ratable in 1780, they were to be considered ratable polls within the meaning of the constitution.

The answer, therefore, to the question proposed, on the authority of this judgment and opinion of the supreme judicial tribunal of the state is, that aliens may or may not be rated, and may or may not be ratable polls, as the legislature in its pleasure may enact; and as to them, the term ratable polls in the constitution does not forever distinguish the same classes of persons, who, at the adoption of the constitution, were designated by and included within it.

Placing so much reliance on this opinion of the court, which, though it wants the power of a judgment in due course of law, is not to be considered extra-judicial, it may be proper for me to add some of the circumstances under which it was given; and the more so as it is known to all those, who remember the agitation of that time, that it did not meet with universal approbation, and that the report of the committee of elections of that year entirely dissented from its positions.

The opinion is pronounced on three abstract questions propounded to the judges by the house of representatives, but the circumstances that called for the opinion are not immaterial to the case.

They are substantially as follows: The town of Boston returned forty-two representatives. The assessors of that town certified, that there were 9,557 ratable polls in the town, which would give the town a right to 42 representatives and leave a fraction of 182 polls unrepresented. But it is obvious, that if there were included in the aggregate of ratable polls 183 aliens, and if aliens were not ratable polls, Boston had exceeded its right of representation, and by the course of decisions, as then understood, the seats of the entire number would be thereby vacated.

A petition against the election was presented, and the

40

committee to whom it was referred reported, that the aggregate number of polls included 706 aliens. It is plain, therefore, that the right of the sitting members depended on the question whether the town, in ascertaining the number of ratable polls, in order to determine the number of representatives it was entitled to send, could constitutionally include, in the number of ratable polls, the polls of aliens residing in the town and by law ratable to public taxes, and predicate a representation thereon which would be a constitutional representation?

Other matters were involved in the controversy on the petition, but a negative answer to this question would be fatal to the sitting members' claims.

Although the committee of elections presented a report differing in its doctrines from the law laid down by the court, no action of the house was had upon it; but what is important no discrimination from that time to the present has been made between the ratable polls of aliens and natives.

Another fact is of some consequence. A bill was introduced to ' establish the legal qualifications necessary to constitute a ratable poll within this commonwealth,' but did not pass into a law. No record preserves the reasons for its being negatived, but many persons can well remember, that the opinion of the supreme judicial court was admitted to settle the question in this way, viz: That the tax act would by the constitution determine who were ratable polls, inasmuch as all who were by such act liable to be rated were ratable polls, and that all who were not made by such act liable to be rated were not ratable polls; and that there was no mode under the constitution, by which an alien should be made liable to assessment, that would not give the town in which he lived a right to count him as a ratable poll.

The same desire which has since prevailed, to diminish the representation, then prevailed. The house returned that year contained 632 members at the election of its clerk.

But the whole argument and opinion in relation to aliens are just as true in their application to any other classes of persons, who at any time have been or now are ratable polls.

All other citizens, who are now included in the tax act, (that is, the last tax act) are ratable polls, and they, and they only, who shall be included in the next tax act, will thereafter, until a subsequent one is made, be the ratable polls on which representation may be predicated.

Aliens are only one class. Native citizens under sixteen years are another class. Native citizens above sixteen and under twenty-one are another

There is some analogy between the political rights of native citizens who are minors, and aliens of any age. Neither class has the personal right to vote, but the number swells the population, and thereby increases the rights of the legal voters where those rights depend on population, as in congressional districts; their property increases the proportion of the public tax paid in the districts where they live, and operates in the apportionment of senators. If, therefore, the legislature, by a provision in the tax act, may make aliens ratable polls or not at their pleasure, whereby a political effect is produced, there seems as sound reason for extending the authority to any and all other classes of citizens, minors or adults, who constitute the subjects of taxation.

Supposing the legislature has such authority, the inquiry next presents itself, how may it be used to effect any considerable reduction in the number of representatives?

No census has been taken, by which the number of polls in the commonwealth above sixteen years of age, and under twenty-one, can be precisely ascertained.

But an approximation may be made to the aggregate of this class, from the United States census of 1830, by which it appears that the white males between fifteen and twenty are 32,864. This column in the census begins a year too soon and ends a year too soon. But probably the male polls between fifteen and sixteen do not differ very much from those between twenty and twenty-one. Supposing the latter class to be the smaller, and that the ratable minor polls numbered in 1830 as many as 32,500, they are not far from 36,000 at the present time. If these are represented, or add to the representation in the house, they give 154 representatives.

By the same census the number of polls of fifty years and upwards in 1830 was 32,766, and is not less than 35,000 at the present time. These give 151 representatives.

If therefore the minor polls hitherto rated or ratable, and the adult polls over fifty years hitherto ratable, should cease to be ratable, the whole number of representatives might be reduced by 304. There would then remain, as appears by the same census, 126,766 polls, now amounting to 139,432, entitling the towns to a representation of not less than 619 members.

It is not possible, from the data thus given, to be precisely accurate. The unrepresented fractions in many towns would have some effect on the total, and the right of one representative, on the first one hundred and fifty polls, would also change the aggregate, and the two items probably about balance each other.

The actual result might, however, be rendered certain, by directing a census to be taken under the authority of the commonwealth; and indeed, by the examination of the returns from each town, in the last United States census, tables more precise might be constructed; but this general view sufficiently well shows the operation of the principle. It will be observed that I have not noticed any exceptions in the class of ratable polls, because such exceptions influence the result too minutely to be taken into this general consideration. No notice is taken, in the foregoing estimate, of the colored population, chiefly because the number is not supposed to be large enough to require it, and because the tables of the census are not prepared with such exactness in reference to them, as to give any satisfactory result. The nearest approximation to be made by the census for 1830 would give for the present time about three thousand colored males in the state over sixteen years of age. But a much larger proportion of this class than the others would come under the exceptions which have already been established by the house of representatives, excluding state and town paupers from the lists of ratable polls.[1]

Nor is it material to attend to aliens as a distinct class. No

[1] This is a mere conjecture.

account being taken of the age of aliens, separate from native citizens, the number of the alien polls over sixteen cannot be ascertained. But the census makes a return of 8,787 foreigners not naturalized, which, if now increased to 10,000, might possibly give 2,500 polls over sixteen years of age. But of these, so many are paupers, that considerable deduction beyond the proportion of their numbers to the whole population must be made.

A law excluding aliens and colored persons from the ratable polls of the state would not diminish the aggregate representation more than from twelve to twenty.

It is plain that any arrangement of the kind under contemplation can only be a temporary remedy for the supposed inconvenience.

The commonwealth, in the rapidity of its growth, under the influence of rational liberty and wise laws, will soon contain an active and busy population, that will give to the classes of ratable polls, then remaining, numbers and power equal to what are possessed by all who are now included in that description.

It will be seen that the progressive increase of population, on which the present number of ratable polls is estimated, is wholly conjectural. The tables of the census give no data for exact calculation, but an estimate formed from the census places the decennial increase at 16.6 per cent., which I presume to be correct.

It is exact enough for the present purpose, to consider this increase as producing the same quantities in the same time, although it is in fact in a geometrical ratio. And it is well enough to take round numbers.

The calculation for representatives is made on the higher ratio, viz: 225 polls for one representative. It is not possible, without devoting more time than could now be bestowed on the subject, and causing more delay than the committee might deem proper, to ascertain the application of the principle in point of fact to each town, or even to see how many towns would, by the adoption of it, lose the right of representation.

Nothing but a rough outline is intended to be exhibited. If, on further examination, it should be thought that the principle might be of any practical utility, it would be easy, with proper care, to trace its operation in detail, and ascertain its precise bearing on every town in the commonwealth.

By the rule of calculation here assumed, the city of Boston has now thirteen representatives for its minor polls, and seven for its polls over fifty years; in all twenty representatives, or within a fraction of one third of its present number.

Should that result be deemed a fair specimen of the effect of the principle through the state, the number of representatives could be thereby reduced nearly one third, and it would take, for its progressively increasing population to restore the aggregate to its present numbers, about twenty years.

But as the assumed mode of calculation gives to the people 923 representatives, as the house is now constituted, which is more than its supposed constitutional character, it is apparent that the application of the whole numbers, in parts, to the several towns, is liable to some error, for which allowance must be made.

Nothing more is intended in the illustration which has been attempted, than to indicate the tendency of a principle, which the legislature has power to adopt.

Having thus presented a view of the power of the legislature, which I think constitutional, and exhibited the probable effect of it, if carried into practice, it is proper for me, in complying with the commands of the honorable committee, to attend to some of the objections, considered as the strongest, which have been urged against its exercise.

There is supposed to be an objection to legislative action on this subject, to any great extent, arising from the third article of the amendments to the constitution made by the convention of 1820.

This objection may be thus stated. By that article every male citizen, of twenty-one years of age, becomes entitled to vote, in case of a residence as therein provided; and provided also, that he 'shall have paid, by himself or his parent, master

or guardian, any state or county tax which shall, within two years next preceding such election, have been assessed upon him, in any town or district of this commonwealth.' If he be not assessed he cannot pay; and if he be not ratable by law, he cannot be assessed. When, therefore, he comes to be twenty-one years of age, he cannot have paid any tax, and of course cannot vote. His right of voting may thus be postponed after he is twenty-one years of age, without his consent.

The whole force of this objection seems to me to bear on the expediency of any action by the legislature, and not upon its constitutional power. The legislature would guard, with great care, the privilege of voting; and especially the privilege secured to the young men, on whose exertions and patriotism so much reliance must be placed for the preservation of our republican institutions. If the objection rests only on expediency, it would not be difficult to arrange the details of a plan by which this supposed evil might be obviated.

The objection leaves untouched the operation of the supposed power of the legislature on minors over sixteen, and under nineteen, or perhaps even twenty years of age.

But the same objection is made to attach to any action of the legislature at the other end of the line. And it must be conceded, that if the legislature prevented persons over fifty (for example) from being rated to a poll tax, all such persons, who had no property, would, in two years, by operation of the constitution, be excluded from the right of voting in the public elections.

How numerous such a class would be, cannot now be known; probably very small. It would certainly be a subject of regret, if a single citizen should be deprived of the elective franchise. But in most operations of a political character, the good of the whole is attended with partial inconveniences. There does not seem to be any fundamental principle violated. Taxation and representation should go together, and he who pays nothing, and is yet protected by the laws, cannot complain because he is not authorized to make them.

Another objection, which is thought by those who urge it to be more formidable in its character, may be thus stated.

By the spirit of the constitution, every corporate town is entitled to at least one representative. All towns which were incorporated at the date of the constitution, whatever may be their number of ratable polls, are secured that right forever. And as 150 ratable polls were required for the first representative, it is expressly provided that 'no place shall be incorporated, with the privilege of electing a representative, unless there are within the same 150 polls.' Many towns have been since incorporated, and enjoy the privilege; but if the character of the ratable polls is changed, by excluding minors and adults, as above suggested, these towns or some of them would no longer contain 150 ratable polls. Therefore, unless they lose their right of representation, the calculation in regard to a diminution of the house would be erroneous, and if they should lose it, a portion of the people, and certain municipal corporations, would be disfranchised.

That one or other of these consequences would follow, seems pretty clear; to what extent is not very certain. That either consequence is an evil, must be admitted; but it is probable that no curtailment of the present number of representatives can be devised by human ingenuity, without being attended with partial inconvenience as a compensation for the general good.

The great objects to be attained are to preserve the corporate right of towns, to maintain an equality between population and representation, and to limit the aggregate number of representatives; and these are in their own nature so conflicting and contrarient, that they cannot be perfectly reconciled. If it be admitted that no present right can be abandoned, in furtherance of the general object, all attempt at reduction must be abandoned. The main object cannot be accomplished unless somebody gives way.

I have no other answer to make to the case above stated than that it is no objection to the constitutional right of legis-

lative action, whatever it may be to the expediency of exercising it.

When a new town is erected out of an old one, no privilege of electing a representative is granted by its act of incorporation. That privilege is derived from the constitution, and the ability of the new town to comply with the requirements of the constitution in such case provided. If the new town has 375 polls, it elects two representatives, and if it has polls enough, it elects three or more. The restraint is imposed on the legislature not to erect the town, unless at the time of the application it contains 150 ratable polls.

The question is yet to be settled, whether if a town, incorporated after the adoption of the constitution, falls into decay, and has at the time of a municipal election less than 150 ratable polls, it may continue to send a representative to the general court. The privilege in perpetuity is conferred only on those towns which existed in 1780.

My own opinion is that such town would lose its right. Certainly if it had chosen two representatives, and so far fell into decay as to have less than 375 ratable polls, it could choose but one. If the case of Danvers, (*ante*, 49,) and the case of Malden, (*ante*, 293,) in the reports of controverted elections, affirm a general principle, this is now the settled law; for in those cases it is resolved that the extent of the right of representation, as given to the towns and districts of the commonwealth by the constitution thereof, is to be regulated by the number of ratable polls, actually existing in the towns and districts, to be represented, at the time of any election.

The only answer to the authority of these cases is, that the diminution is made in one instance by death, removal, or decay; in the other, by a legislative disqualification. In both the fact exists, namely, a want of a sufficient number of legal ratable polls; and it is this fact, and not the cause of it, by which the municipal right of the corporation is to be ascertained.

On the whole, therefore, I beg leave very respectfully to

submit to the honorable committee, that, according to the best opinion I can form, the elaborate and well argued judgment of the supreme judicial court, above referred to, affirms and maintains the proposition, that the legislature may by law establish what shall or shall not be a ratable poll, by providing in the tax act who shall or shall not be liable to be rated; and that when this is done by such legislative act, the representation in the house of representatives must be predicated upon the number of such ratable polls, according to the ratio which the constitution has established; and that any inconvenience which might result to individuals or corporations by the exercise of such legislative power is no reason against the constitutional right, but addresses itself to the sound discretion of the legislature, to act or not act, as in their wisdom the general interests of the commonwealth may require in the premises.

JAMES T. AUSTIN,<br>
Attorney General.

*February* 10*th*, 1835.

---

## 1836.

---

### COMMITTEE ON ELECTIONS.

Messrs. *William J. Whipple*, of Cambridge, *Nathan C. Brownell*, of Westport, *Edward G. Loring*, of Boston, *Benjamin Thompson*, of Charlestown, *Jubal Harrington*, of Worcester, *William Child*, of Springfield, *Nathaniel Hinckley*, of Barnstable.